## Davis v. New England Mut. Life Ins. Co. of Boston, Mass.

(Decided March 27, 1936.)

WELLS & WILSON and H. PATE and L. B. ALEXANDER for appellant.

WM. MARSHALL BULLIT, LEO T. WOLFORD, and ROBERT LEE BLACKWELL and CHARLES FERGUSON for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and plaintiff below, Charles L. Davis, resides in Birdsville, Livingston county, Ky., where he has operated, since 1906, a general merchandise store, and since 1909 he has acted as United States postmaster, with the office in his store. In 1920 he obtained from the appellee and defendant below, New England Mutual Life Insurance Company of Boston, Mass., a policy on his life, whereby it agreed to pay his estate, upon his death, if the policy was then in force, the sum of $2,000. The policy also contained this disability provision: "If the insured before attaining the age of 65, provided premiums have been duly paid and this policy is then in full force, becomes physically or mentally incapacitated to such an extent as to be wholly and permanently unable to engage in any occupation or profession or to perform any work for any compensation, gain or profit, and after such disability has existed for 90 days, shall furnish due proof thereof to the company at its home office, the company will pay to the insured an income of $20.00 a month during the continuance of such disability."

On September 8, 1934, plaintiff filed this action in the Livingston circuit court against defendant, seeking to recover of it under the inserted clause of the policy compensation for total disability as therein contemplated from the ——— day of September, 1932, to the date of the filing of the action, with interest thereon, upon the ground that in September, 1932, he became totally disabled within the meaning of that provision of the policy, but he never gave defendant notice of such disability before filing his petition. It was later amended so as to embrace the time that had elapsed since its filing. The answer admitted the execution of the policy, but denied all the other material averments of the petition, and affirmatively pleaded in another paragraph that plaintiff defaulted in the premium due April 16, 1934, as well as succeeding quarterly ones, and that under the terms of the policy he was given extended insurance for the full amount to the time to

which he was entitled after deductions allowable by the policy contract, and which extension expired on August 28, 1934, at which time the policy was canceled as a lapsed one, of which plaintiff received notice. Following pleadings made the issues and upon trial, the court sustained defendant's motion for a peremptory instruction in its favor followed by a verdict to that effect and by a judgment dismissing the petition. Plaintiff's motion for a new trial having been overruled, he prosecutes this appeal.

But two questions are presented, and which are: (1) Whether plaintiff under the proof was "totally disabled" within the meaning of the inserted provision from the policy so as to entitle him to the benefit of it? and (2) whether the failure to give notice of the commencement of the alleged disability until after the policy was canceled operated to defeat the right of action or only to postpone it? It is vigorously argued by counsel for defendant that the testimony failed to establish the required disability entitling plaintiff to recover, and that the notice to it within a reasonable time of the commencement of the disability or of its duration was and is a condition precedent to the maintenance of the action by plaintiff; whilst counsel for plaintiff advocate and argue to the contrary on both propositions, as a consequence thereof, counsel then insist that the court erred in directing the verdict returned by the jury, and in overruling plaintiff's motion for a new trial based upon such alleged error. Our task is to determine which of the two contentions is correct, and which we will now endeavor to discharge.

Manifestly, plaintiff is not entitled to recover if his proven condition is such as not to rise to the degree of "total disability" within the meaning of the quoted language of the policy. That disability as so incorporated therein is expressed to be such as to render him "physically or mentally incapacitated to such an extent as to be wholly and permanently unable to engage in any occupation or profession, or to perform any work for any compensation, gain or profit." The extent of the disability, and its consequent impairment of the insured's capacity to work or labor for compensation, gain, or profit, etc., has been defined by this and other courts in numerous opinions, the latest one being Ætna Life Insurance Co. of Hartford, Conn. v. Gullett, 262 Ky. 1, 89 S. W. (2d) 1. In that case the com-

prehension and application of the phrase "total disability" is thus defined: " 'Total disability' does not mean utter helplessness, and 'permanent disability' does not mean utter helplessness, and a man to be totally and permanently disabled does not have to be reduced to a state wherein he is entirely dependent on others and is absolutely without hope of improvement." Authorities are then cited in support thereof, including the prior cases from this court of Consolidation Coal Company v. Crislip, 217 Ky. 371, 289 S. W. 270; Ætna Life Insurance Co. v. Daniel, 251 Ky. 760, 65 S. W. (2d) 1025; and Travelers' Insurance Co. v. Turner, 239 Ky. 191, 39 S. W. (2d) 216.

In combating this defense (1) plaintiff's counsel confine themselves to only a discussion of the testimony in the case. They call our attention to no prior opinion wherein similar facts as disclosed by the testimony herein were held by us or by any other court to constitute total disability, but they, of course, are compelled to accept and abide by the interpretation given in the cited cases and others of like tenor. Plaintiff and his home physician testified as to the character and extent of his disability. He testified that in August, 1932, he was scratched by a cat, but the scratches soon healed. He stated that following it "I began to go down and from that time on I kept on going down and getting sicker and weaker. Finally I got to where I could go no farther, so finally wrote to Dr. Markey." The latter then had a position in the Kentucky Insane Asylum at Lakeland, Ky., and he was both a friend and relative of the insured. He directed plaintiff to consult a physician, and recommended the use of insulin, but that advice was not taken until May, 1933, when plaintiff called on his local physician, who coincided with Dr. Markey, and he prescribed a diet with the use of insulin, which latter plaintiff thereafter administered to himself. He continued without interruption from the day of the cat bite to and including the day of the trial to operate his store and to perform the duties of postmaster in practically the same manner that he had done from the commencement of such activities. He hired no help to assist him in the store, although he had a grown-up son who aided to some extent when he was at home, but who at the trial of the case had been absent from home for six months or more in attendance as a student of the State University at Lexington, Ky.

The proof furthermore shows by plaintiff himself that, while he curtailed to some extent the performance of chores around the house, yet he continued to milk the cows and to build the fires, but which latter was done to some extent by the son until he entered the University. Some assistance was rendered by plaintiff's wife, but it does not appear that she rendered any more aid either in operating the store or in attending to the post office than she had theretofore done—the residence of the two, as we gather, being connected with the mercantile establishment. Plaintiff was asked and answered:

"Q. Are you able to perform your duties as a postmaster? A. Yes sir, I am, with the kindness of the people. In the grocery business too; everybody is always helping me at all times.

"Q. Can you do the things required of you as well now as you did before you began suffering with that disease? A. No sir, I didn't ask anybody to help me then. * * *

"Q. How do you feel now? A. Just like I told you. I am all right until I exercise. If I just sat around all the time it would not be so bad, but after a day's work I am weak when evening comes and all that. I just can't go on and do like I did. It's all I can do to get to the house. * * *

"Q. What duties have you done since you took ill in 1932? A. Nothing, but milk the cow.

"Q. Where do you keep the cow? A. At the barn.

"Q. How far is that from the residence? A. About as far as from here to the courtyard gate. I would say about 300 feet.

"Q. Who carries in the wood and coal? A. I have a furnace. The wood and coal are kept in the basement. Boy does that when he's there.

"Q. How old is your son? A. Twenty.

"Q. Does he assist with the duties of the household? A. He is not at home."

Plaintiff's home physician testified that the cat bite had nothing to do with producing his diabetic condition except the possibility that the shock therefrom may have precipitated it. He further testified that he began treating plaintiff on May 1, 1933, and prescribed the proper treatment, including dietary regulations which

plaintiff thereafter carried out himself, and that his condition has improved therefrom. He was then asked and answered:

"Is the gentleman, the plaintiff, able to do any kind of work, doctor?  A. I should say he might be able to do very light work.

"Q. Is he able to follow his usual occupation as postmaster, grocery man and general storekeeper, and do all the things required of him in his usual and customary manner, as he did before he became sick?  A. I don't think so in his usual and customary manner.

"Q. What do you think will be the result of the disease on this man?  A. He will have a fairly normal span of life if he follows the treatment prescribed.

"Q. Will he be cured of it in your opinion?  A. He will never be cured of this disease.

"Q. I believe you say that if he abides by your advice, that is, continues the treatment of insulin and keeps strictly to his diet, that he probably will live throughout a normal span of life, is that right?  A. Yes sir.

"Q. What would you tell the jury as to this man, that is, to as whether or not as to performing the duties of his occupation. and the things pertaining thereto, whether or not he is. totally and permanently disabled from doing substantially all these things in his usual and customary manner?  A. The man has diabetes and of course his physical strength will always be impaired; he will never be up to par.  I don't think he would ever be able to perform the labors he did before he developed this disease; don't think he is able to perform them now.

"Q. I will ask you if in the opinion of you as the physician of this patient, Mr. Davis, the plaintiff, he is able to do or perform fully any occupation for profit or gain?  A. I don't think he would be able to perform it fully.  * * *

"Q. Dr. Dunn, with what regularity have you seen Mr. Davis since May, 1933?  A. Right after I saw him in May, 1933, I saw him quite often.  Once a week, then twice a month, but for the past year I have not seen him at all except on April 12, 1935.

"Q. That was last Friday?  A. Yes.

574

"Q. I believe you made an examination at that time? A. Yes sir.

"Q. How did you find his vision on last Friday's examination? A. It was good.

"Q. How about his lungs? A. Good.

"Q. How about his heart—pulse rate? A. His pulse rate was rapid and increased on exercise, but it was regular.

"Q. Eighty-four, I believe you said? A. Yes, sir.

"Q. Normal reflexes? A. Yes, but slightly exaggerated.

"Q. You first became professionally acquainted with Mr. Davis on May 1st, 1933, I believe? A. Yes sir.

After so testifying, he was asked as to his opinion upon the extent of plaintiff's disability and answered: "I considered the man totally disabled." Before the last default in the payment of premiums on April 16, 1934, there was a prior one in February, 1933, followed by plaintiff's application, according to the requirements of the policy, for a reinstatement of his insurance, and in it he was asked this question: "Are you in good health?" to which he answered: "Yes." The question, therefore, for determination is—whether or not under the testimony as so appearing plaintiff was totally disabled within the contemplation of the policy provision upon which he relies so as to entitle him to recover the compensation therein provided for?

We have had the question presented to us in a number of cases, some of the most recent of which are Ætna Life Insurance Co. v. McCullagh, 191 Ky. 226, 229 S. W. 1033, 1035; Equitable Life Assurance Society v. Burns, 254 Ky. 487, 71 S. W. (2d) 1009; and Mutual Life Insurance Co. v. Dause, 256 Ky. 448, 76 S. W. (2d) 233, 236. In the McCullagh Case, in which other similar prior ones are cited, the facts were much stronger in support of the contention of total disability than is true in this one, and we held that plaintiff had not brought his case within the provision of the policy obligation which was similar to the one here involved. In reversing the judgment upholding the right of recovery, after reciting the substance of the testimony, we said: "The evidence does not impress us as it did the court below, in that it does not carry the conviction that appellee has shown such a total disability as was contemplated by the terms of the policy. * * * This

court is committed to a liberal construction of policies such as that in evidence, liberality toward insured, but beyond certain limits we are unwilling to go. We must not do violence to clear and explicit language to fix or increase liability by construction when it does not exist by a fair interpretation of the contract. * * * It is not disputed that appellee's injury is painful, serious, and permanent. Our inquiry is addressed to the effect it has upon his ability to perform his customary duties. That he cannot perform them as well or with the same celerity as formerly goes without saying. He will necessarily suffer inconvenience. A rearrangement of his daily schedule may be deemed advisable. The diversion or change from a sitting or standing position after trips to the bank and post office. He may be sur- a few hours' continuous work may be found in the prised at his accomplishment after an earnest, persistent effort to do his work. The issue raised by the pleadings involved only the question of total disability.'' The opinion then refers to the cases of Continental Casualty Co. v. Mathis, 150 Ky. 477, 150 S. W. 507; National Life & Accident Ins. Co. v. O'Brien's Ex'x, 155 Ky. 498, 159 S. W. 1134; Hartford Accident & Indemnity Co. v. Davis, 184 Ky. 487, 210 S. W. 950; and Doyle v. New Jersey Fidelity & Plate Glass Insurance Co., 168 Ky. 789, 182 S. W. 944, Ann. Cas. 1917 D, 851, and applies the facts in them to the situation then in hand concluding that the evidence in the McCullagh Case was insufficient to show total disability within the purview of the policy provision.

The physician witness in the Burns Case, after giving the general facts as to the insured's physical condition, as did plaintiff's physician in this case, was made to say that ''it is my present judgment he is totally and permanently disabled,'' but we appraised the testimony as showing that, perhaps, Burns in that case was partially disabled, and that, eliminating the final statement of the physician witness, the evidence did not tend to show total disability. With reference to that positive statement by the professional witness, we said, in substance, that it was not sufficient to overcome the indisputable history of the case as manifested by the uncontroverted facts, and that as a consequence ''total disability'' in that case was not established

The Dause Case was similarly dealt with by us. The patient there became afflicted with tuberculosis,

but it had been arrested, as was the diabetic condition in this case. Plaintiff in that case went West, seeking a more favorable climate, where he stayed for sometime, and upon his return moved from his farm to the county seat of his county (Somerset) and engaged in running a rooming and boarding house for a short while. He applied for and was paid temporary benefits under his policy, and after their suspension he made no application to his insured for total or other benefits for some years thereafter, when he filed suit to recover for total disability. It was removed to the federal court for the Eastern District of Kentucky, and at the trial the judge thereof (Judge Cochran) intimated that he would sustain defendant's motion for a peremptory instruction, when plaintiff by his counsel dismissed the action without prejudice and later filed another one in the Pulaski circuit court to recover $2,900. At the trial of that action the physician witnesses testified that plaintiff was afflicted with pulmonary tuberculosis, and, when asked if it totally disabled him from performing the duties of a farmer, one of them answered: "I think so." He further said in answer to a proper question that: "There might be some business or occupation that required very little and light work [that plaintiff might do], but anything that required any manual labor or any hard work at all, in my opinion he has not been able to do that." The opinion then recites the fact that according to the insured's testimony he did work from 1926 to 1929, and earned "a livelihood for himself and family," that he was not confined to his bed, and that: "It may be true, however, that Dause had not completely recovered from his tubercular condition, but his own testimony discloses that his disability, if any, at the most was only partial. It must be remembered that under the disability clause of his policy he was entitled to this compensation only in case of total disability. In our view, there is no evidence conducing to show that he was totally disabled from performing any work even as a farmer." The opinion then cites prior cases from this court, and concludes that a directed verdict for defendant should have been given. There is nothing inconsistent between the holdings of those opinions and the first cited ones, supra, wherein the phrase "total disability" is defined. It does not mean utter helplessness, but it does comprehend more than impairment of health or partial disability.

Here we have plaintiff performing the identical work after the commencement of his alleged disability, and throughout its period, that he had done for a quarter of a century prior thereto. He ran his store, bought his supplies therefor, built fires for it and his residence located thereon or nearby, milked the cows, and, perhaps, performed other chores; but the recited ones are enough to show that his disability was only partial. Consequently, when he applied for reinstatement in February, 1933, he stated that his health was then good, although he was in a worse condition at that time than he was at the time of the filing of this action and about the time of the trial, according to the testimony of his physician, who stated, as will be remembered, that "his condition has improved since that time." In the very nature of things, "total disability" implies that there are lesser degrees of disability, but which lower degrees are not embraced within the policy provision sued on, since it is not a "sick benefit" provision, but only a "disability" one, and the extent of disability must be "total" before the obligation becomes an enforceable one.

The incipient ailment with which plaintiff was afflicted (diabetes), according to the testimony of his physician, had become arrested, as was true in the cited cases, and the same professional witness testified that, if his directions were followed by plaintiff, he would live "throughout a normal span of life." He did not deny but that plaintiff was and would continue to be able to perform the activities that he had continuously done, but that he might not do so "in his usual and customary manner," nor did witness think that he would be able to perform them "fully," and he stated that "he will never be up to par" or "able to perform the labors he did before he developed this disease." That testimony is corroborated by the undisputed proof that plaintiff has continued to perform his former labors and that he was in better physical condition at the time his physician last examined him shortly before the trial than when first visited by him nearly two years prior thereto.

We deem it unnecessary to further analyze the testimony or to further pursue the discussion, since under the facts and the law as contained in the cited cases we are forced to the conclusion that there has been a failure of proof in the case and that the court

578

properly directed the verdict in favor of defendant upon this ground alone, and which renders it unnecessary to consider or determine the other one.

Wherefore, for the reasons stated, the judgment is affirmed.